Billings, Thomas P., J.
The claimants, Roberto Cordones-Rodríguez (Cordones) and Franklin Diaz (Diaz), seek the return of $10,040 furnished by Diaz to the Woburn Police Department to secure the bail of Cordones. For the following reasons, the claimants’ motion is ALLOWED.
FACTS
This is an asset forfeiture action under G.L.c. 94C, §47. To the Complaint are attached the affidavit of Lt. Robert Rufo of the Woburn Police, together with a report of the Southern Middlesex Regional Drug Task Force which the Rufo affidavit incorporates by reference. The report describes an investigation into drug dealing by Cordones (including several undercover *111 purchases), his arrest, the search of his vehicle, and the seizure of property including Cordones’s Honda Accord, several cell phones, and $604.27 in currency. There, the report stops.
The Rufo affidavit does not pick up the thread, stating only and conclusorily that based on his training and experience the affiant believes there is probable cause to forfeit all of the property seized. For information concerning the seizure of the $10,040 in currency at issue here, one must look to the claimants’ motion papers; specifically, the affidavit of Franklin Diaz, one of the claimants. Diaz, who is Cordones’s employer and a long-time acquaintance of his family, avers that on April 3, 2009 he received a call informing him that the claimant was under arrest and that his bail was $10,000 (plus the bondsman’s $40 fee).
Diaz assembled the necessary funds overnight— $6,700 of Cordones’s money he was holding to purchase a truck for him, plus $3,300 of his own — and went to the Woburn Police Station with it at 9:40 the next morning. After a nearly two-hour wait, he met a man wearing a shirt with a “DEA” emblem, who accepted and counted the bail money and fee. Diaz went for lunch at 12:30, returned, and was told by Lt. Rufo, “We ran into a little problem. We put a K-9 on the money and we found a residue of narcotics. We’re not releasing him today, and we’re confiscating the money.” Diaz asked for a receipt, and was provided with a one-page document, dated April 4, 2009 and reading as follows:
As a result of a positive alert indication from the Wakefield Police Department K-9, for the presence of narcotic residue on $10,040.00 in United States currency, the Woburn Police Department has seized such funds.
The receipt is signed by Rufo and Diaz.
A subsequent bail hearing reduced Cordones’s bail to $1,000. Diaz posted this amount through a cash advance on his credit card, and Cordones was released on August 5. The $10,040 remains in the custody of the Woburn Police.
DISCUSSION
Massachusetts law provides for the forfeiture of “[a]ll moneys, negotiable instruments, securities or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance,” or that are “proceeds of such an exchange,” or that were “used or intended to be used to facilitate a violation of’ the narcotics laws. G.L.c. 94C, §47(a)(5).
A district attorney or the attorney general may petition the superior court in the name of the commonwealth in the nature of a proceeding in rem to order forfeiture of a conveyance, real property, moneys or other things of value subject to forfeiture under the provisions of subparagraphs (3), (5), and (7) of subsection (a) . . . In all such suits where the property is claimed by any person, other than the commonwealth, the commonwealth shall have the burden of proving to the court the existence of probable cause to institute the action, and any such claimant shall then have the burden of proving that the property is not forfeitable pursuant to subpar-agraph (3), (5), or (7) of said subsection (a).
G.L.c. 94C, §47(d). “During the pendency of the proceedings the court may issue at the request of the commonwealth ex parte any preliminary order or process as is necessary to seize or secure the property for which forfeiture is sought and to provide for its custody . . . Process for seizure of said property shall issue only upon a showing of probable cause . . .” G.L.c. 94C, §47(f)(l).
“The Commonwealth’s burden under the forfeiture statute is to prove probable cause to proceed, in the form of sound reason to believe that the money-drug nexus exists.” Commonwealth v. Brown, 426 Mass. 475, 478 (1998), citing Commonwealth v. Fourteen Thousand Two Hundred Dollars, 421 Mass. 1, 9 (1995). “The probable cause standard in §47 does not require the Commonwealth to establish a link between the money seized and a particular drug transaction. The Commonwealth must show only that ‘the money was probably derived from illegal drug transactions.’ ” Id., citing United States v. $250,000 in U.S. Currency, 808 F.2d 895, 899-900 (1st Cir. 1987).[2]
In this case, the Commonwealth contends that probable cause existed as a result of a positive alert by a drug-sniffing dog, as well as the fact that Cordones had been arrested in the past for drug-trafficking. The claimants counter that a positive canine alert is insufficient, with or without a prior drug arrest, to establish probable cause.
I agree that a prior drug arrest contributes little to the assessment of whether the arrestee’s bail money is drug-related. The separate question of what 'weight, if any, a canine alert on currency deserves to receive in the probable cause calculus has proven controversial in the federal courts. Citing studies and expert testimony to the effect that a high percentage of the U.S. currency supply is contaminated with cocaine residue, some courts have found the “barking of a dog” — even a trained drug dog — to be “at best, of limited value” in making the required connection between particular currency and drug trafficking. United States v. $12,480 in U.S. Currency, 510 F.Sup.2d 167, 171-72 (D.Mass. 2007; Gorton, J.); accord, United States v. $124,700 in U.S. Currency, 458 F.3d 822, 826 n.1 (8th Cir. 2006); United States v. $10,700.00 in U.S. Currency, 258 F.3d 215, 229-30 (3d Cir. 2001) United States v. $506,231, 125 F.3d 442, 453 (7th Cir. 1997); United States v. $5,000 in U.S. Currency, 40 F.3d 846, 849 (6th Cir. 1994); Muhammed v. Drug Enforcement Agency, 92 F.3d 648,653 (8th Cir. 1996); United States v. U.S. Currency, $30,060.00, 39 F.3d 1039, 1042 (9th Cir. 1994); UnitedStates v. $639,558 in U.S. Currency, *112 955 F.2d 712, 714 n.3 (D.C.Cir. 1992); United States v. One Lot of Currency Totalling $14,665, 33 F.Sup.2d 47, 57-58 (D.Mass. 1998; Gertner, J.).
At least three decisions, on the other hand, have been dismissive of the “ever-lasting scent, global contamination theory” (United States v. $506,231, 389 F.3d 1149, 1165 (11th Cir. 2004) (en banc)), and have accorded significant weight to a canine alert on currency. Id.; United States v. Funds in the Amount of $30,670, 403 F.3d 448, 456-60 (7th Cir. 2005); United States v. $22,474.00, 246 F.3d 1212, 1216 (9th Cir.2001).
In $30,670, the Court of Appeals was persuaded (as the district court judge had been) by scientific evidence that trained canines are reacting not to the cocaine itself, but to cocaine by-products such as methyl benzoate. Id. at 458. According to this view, pure cocaine can remain in trace amounts on an exposed dollar bill for years, but “methyl benzoate is highly volatile and will evaporate at an exponential rate from tainted currency, so currency recently exposed to cocaine and returned to general circulation will quickly lose any detectable odor of methyl benzoate, even if the particles of cocaine remain.” Id., citing Kenneth G. Furton et al., “Novel Sample Preparation Methods and Field Testing Procedures Used to Determine the Chemical Basis of Cocaine Detection by Canines,” in Forensic Evidence Analysis and Crime Scene Investigation 56, 58 (John Hicks et al., eds., 1997). The Seventh Circuit found that this evidence undercut the assumption that canine alerts may have been triggered by currency contamination unrelated to the activities of its current possessor.
“The significance of canine alerts is largely a scientific question,” $124,700, 458 F.3d 822, 826 n. 1, going well beyond that which is judicially noticeable. The record in this case includes no expert testimony, no scientific literature, and no other basis for resolution of the question, or for the proper application of whatever scientific principles might emerge to the facts surrounding the Wakefield dog’s interest in the currency served up to it.
Nor is there any evidence concerning the training, experience, relevant certifications, error rate, or other indicia of reliability of the Wakefield dog. The undoubted fact that all dogs go to heaven does not mean that all are inerrant while here on earth. See Illinois v. Caballes, 543 U.S. 405, 411-12 (2005) (Souter, J., dissenting) (“The infallible dog... is a creature of legal fiction. Although the Supreme Court of Illinois did not get into the sniffing averages of drug dogs, their supposed infallibility is belied by judicial opinions describing well-trained animals sniffing and alerting with less than perfect accuracy, whether owing to errors by their handlers, the limitations of the dogs themselves, or even the pervasive contamination of currency by cocaine”), and cases cited; Commonwealth v. Ramos, 72 Mass.App.Ct. 755, 781 (2008) (relating motion judge’s finding that “false positives constitute a general problem for drug-detecting dogs”).
Infallibility, of course, is not required for probable cause, but there should be at least a minimal showing of reliability. On this evidence, we have only the canine version of the unnamed informant of untested veracity. See Commonwealth v. Upton, 394 Mass. 363, 375 (1985). Contrast Commonwealth v. Watson, 430 Mass. 725, 735 (2000), and Commonwealth v. Welch, 420 Mass. 646, 655 (1995), in which an alert by a properly accredited canine to non-currency items was held to contribute materially to probable cause to search.
In short: the Commonwealth has not, in this case, produced evidence amounting to probable cause to believe that Cordones’s ball money was “furnished or intended to be furnished ... in exchange for a controlled substance,” or was “proceeds of such an exchange,” or was “used or intended to be used to facilitate a violation of’ the narcotics laws, as required by G.L.c. 94C, §47(a)(5).
ORDER
For the foregoing reasons, the claimants’ Motion for Return of Property is ALLOWED. The Commonwealth shall return the $10,040, tendered by Franklin Diaz on April 4, 2009 as bail for Roberto Cordones-Rodríguez, to the Clerk of the Court of Middlesex County, from whom Diaz may pick it up.

In Commonwealth v. 2004 Audi Sedan, 73 Mass.App.Ct. 311, 318 (2008), a majority of an Appeals Court panel held that “the Commonwealth need not demonstrate in its forfeiture complaint the existence of probable cause, but rather, the showing of probable cause is its burden at the trial on the complaint.” The concurrence, by contrast, read the language of section 47 to mean “that probable cause must be shown in the complaint and its accompanying affidavits such that it may be tested by a motion to dismiss.” Id. at 322 (Rubin, J., concurring). By this standard, of course, the materials attached to the Complaint in this case — which do not mention the $10,040 in bail money, let alone establish probable cause to seize it — would fall short.
The SJC has granted further appellate review in 2004 Audi In the meantime, I have here assumed that at least when confronted with a dispositive motion such as the one before me, the Commonwealth must come across with a showing of probable cause to forfeit, based on facts known to it at the time the action was commenced. This is, I believe, a necessary consequence of “the burden of proving to the court the existence of probable cause to institute the action,” which section 47(d) assigns to the Commonwealth.

For example, even accepting that methyl benzoate volatilizes quickly, I am in no position to say whether degradation of its chemical precursor, cocaine hydrochloride, into methyl benzoate occurs with similar rapidity, or whether methyl benzoate instead might be generated gradually, then volatilize quickly. Nor can I say whether drug detection canines generally — or the Wakefield dog in particular — react exclusively to methyl benzoate, or might instead alert to any of the more persistent components of cocaine residue.